1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

SANDRA L. SUMMERS, individually
and as personal Representative of the
Estate of JOHN MICHAEL SUMMERS,
deceased,

                    Plaintiff,

        v.

SALMON BAY BARGE LINE, INC.,

                    Defendant.

CASE NO. 12-5859 RJB

ORDER ON CROSS MOTIONS FOR

SUMMARY JUDGMENT

This matter comes before the Court on the Plaintiff's Motion for Summary Judgment

(Dkt. 15) and Defendants Cross Motion for Summary Judgment (Dkt. 20).  The Court has

considered the pleadings filed in support of and in opposition to the motions and the file herein.

This case arises from the February 2012 death of longshoreman John Michael Summers

aboard the barge BOAZ, which is owned by Defendant Salmon Bay Barge Line, Inc. ("Salmon

Bay").  Dkt. 1.  Plaintiff's Complaint asserts claims against Salmon Bay, as vessel owner, under

§ 905(b), "Negligence of Vessel," of the Longshore and Harbor Worker's Compensation Act, ("LHWCA"), 33 U.S.C. §§ 901 *et seq.* Dkt. 1. Any claim under § 905(a), "Employer Liability" is not at issue in these motions.

The instant motions involve claims under § 905(b) regarding a vessel owner's turnover duty to warn and turnover duty of safe condition announced in *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156, 166 (1981). *Scindia*'s turnover duty to warn requires the vessel to warn the stevedore of any latent hazards that are known, or should be known to the vessel, and are unknown and unobvious to a competent stevedore regarding the vessel or with respect to its equipment. *Scindia*, at 167. *Scindia*'s turnover duty of safe condition requires the vessel to exercise "ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property." *Id.*

Plaintiff moves for partial summary judgment against Salmon Bay, as vessel owner, for violations of various provisions of the Occupational Safety and Health Administration's ("OSHA") regulations found at 29 C.F.R. § 1910.1200 (regarding hazard communication), 29 C.F.R. § 1918.93(d)(4) (regarding longshoring activities and hazard communication), and the *Scindia* turnover duty to warn. Dkt. 15, at 24. Salmon Bay opposes Plaintiff's motion, and moves for summary judgment seeking dismissal of both Plaintiff's § 905(b) claims under *Scindia* for breach of the turnover duty to warn and turnover duty of safe condition. Dkt. 20. For the reasons set forth below, Plaintiff's motion should be denied, and Salmon Bay's motion should be granted, in part, and denied, in part.

## I.     BACKGROUND FACTS AND PROCEDURAL HISTORY

## A.  BACKGROUND FACTS

Salmon Bay operates various tugs and barges.  Dkt. 20-2.  The barges are unmanned and have no crew.  Dkt. 20-2, at 1.  Salmon Bay runs a facility at Swan Island, Portland, Oregon.  Dkt. 20-2, at 1.  When a barge arrives at Swan Island, the tug crew ties the barge to the dock, or if there is another barge there, alongside the first barge.  Dkt. 20-2, at 2.  The hatch covers of the barges are closed when the barge is turned over to the Salmon Bay shore based employees.  Dkt. 20-2, at 2.  Salmon Bay shore based employees, who are responsible for loading and unloading the barges, are stevedores or longshoremen.  Dkt. 20-2, at 2.  In addition to loading and unloading the barges, the stevedores take samples and check on the product being shipped.  Dkt. 20-2, at 2.

Since the late 1990s, Salmon Bay has transported ammonium lignosulfonate ("lignosulfonate") on a regular basis from British Columbia, Canada to Swan Island, Portland, Oregon aboard its barges.  Dkts. 18, at 9 and 20-2, at 1.  Neucel Specialty Cellulone, Inc., of Port Alice, British Columbia, Canada ("Neucel"), sold the lignosulfonate at issue here.  Dkt. 18, at 14.

Neucel produced a material data sheet ("MSDS") on lignosulfonate, and Salmon Bay has had the MSDS since at least June 15, 2010.  Dkt. 18, at 18.  Other than reading the MSDS provided by Neucel, Salmon Bay did not ever evaluate lignosulfonate to determine if it was hazardous.  Dkt. 18, at 20.

Neucel's MSDS on lignosulfonate was originally created on July 5, 2004 by Stephen Sam, and reviewed by Khalid Jasim on May 27, 2012.  Dkt. 18, at 61-64.  The MSDS describes lignosulfonate as a "dark brown viscous liquid with slight odor."  Dkt. 18, at 61.  It provides that the product "[w]ill not decompose under normal conditions."  *Id.* at 62.  Under the "Health Hazard Information" section, "effects of over exposure" is listed to be "none known" and the

emergency first aid procedures for inhalation provides "move to fresh air." *Id.*, at 62. According to this MSDS, ventilation is "not normally required." *Id.*, at 63. Further, under "Special Precautions" it provides: "[t]his material is biodegradable. Use caution when opening unvented containers of water solutions. Microbial activity may cause pressure accumulation." *Id.*

Lignosulfonate is a viscous dark brown liquid left over from the paper making process, and is used on dirt roads to control dust. Dkt. 24, at 7. According to Plaintiff's expert, lignosulfonate is "an organic mixture that will biodegrade/decompose." Dkt. 16, at 7. "The biodegradation/decomposition process produces carbon dioxide and displaces oxygen from the air." *Id.* Plaintiff's expert opines that "[e]xposure to atmosphere containing less than 12% oxygen can bring about unconsciousness without warning and may cause such symptoms so fast that the afflicted individual cannot self-rescue or protect themselves." *Id.,* at 8.

In the three years prior to the accident, the Barge BOAZ, which is owned by Salmon Bay, was used either to transport lignosulfonate or to receive it from another transporting vessel, the barge YUKON, and then used to discharge it into trucks. Dkt. 18, at 13. The barge YUKON is owned by Barge Yukon, Inc. (Dkt. 18, at 14) and was also used to transport lignosulfonate. Dkt. 18, at 13. Kay Bell, Jr. is the president and sole shareholder of Salmon Bay and the president of Barge Yukon, Inc. Dkts. 18, at 7-8, and 28.

From around February 13, 2012, to at least February 19, 2012, the BOAZ was moored starboard side to the dock at Swan Island, Portland, and the YUKON was moored to the portside of the BOAZ. Dkt. 20-5, at 4. Salmon Bay stevedores were attempting to pump lignosulfonate from the YUKON into the BOAZ. Dkts. 20-14 and 23, at 44-45. Initially, they had difficulty pumping the lignosulfonate from the YUKON because it was cold and the material was very thick. Dkt. 23, at 44. They decided to run the pump on the BOAZ and send wash water into the

YUKON in order to prime the YUKON's pumps.  Dkts. 20-14, at 3 and Dkt. 20-10, at 4.
Although there were deficiencies with the BOAZ pumping system (Dkt. 23, at 17-29), by
February 19, 2012, they had the YUKON's pumps running (Dkt. 20-14, at 3) and were not using
the BOAZ pumps (Dkt. 20-14, at 3).

On February 19, 2012, the Salmon Bay stevedores, including the decedent Mr. Summers,
Jeffery Thomas, and Robert Parker were pumping lignosulfonate into the number 3 tank on the
BOAZ from the YUKON.  Dkt. 20-5, at 4.  Mr. Summers had only been working as a barge off-
loader for a few days.  Dkt. 24, at 7.  They had the hatches on the BOAZ open so they could
visually observe how full the tanks were.  Dkt. 20-5, at 4.  Mr. Thomas testified that they had to
have the hatches open to visually monitor the amount of material in each of the tanks because if
too much material was in either on the port or starboard side, the vessel would list.  Dkt. 46, at
46-48.  Hatches to various tanks on the BOAZ had been open on and off for days.  Dkt. 20-5, at
4.

Decedent John Michael Summers was first aboard the BOAZ working around tank C3.
Dkt. 23, at 88.  There was no label or tag on tank C3.  Dkts. 17, at 6 and 18, at 23-24.  Access to
tank C3 is through a hatch with 18.5" x 24.75" hinged opening.  Dkt. 18, at 34.  At the time, tank
C3 contained about 12 feet of lignosulfonate.  Dkt. 18, at 51.

Robert Parker arrived at work the morning of the 19th and went aboard the YUKON.
Dkt. 18, at 96.  He saw Mr. Summers on the BOAZ and they waved at each other.  Dkt. 23, at 88.
At that time, Mr. Parker observed Mr. Summers looking into tank C3 on the BOAZ.  Dkt. 23, at
88.  Mr. Parker turned away to examine some equipment, and less than a minute later, Mr. Parker
turned back, but could not see Mr. Summers anymore.  Dkt. 23, at 89.  Mr. Parker searched the

1  BOAZ.  Dkt. 23, at 89.  He looked into tank C3, and noticed that the product was moving, which

2  it normally did not do.  Dkt. 23, at 89-90.  Mr. Parker then called 9-1-1.  Dkt. 23, at 90.

3  Mr. Parker testified that the when the fire department arrived, it requested the MSDS on

4  the substance in the tank.  Dkt. 18, at 99.  Mr. Parker could not find the MSDS in the office of

5  the BOAZ and testified that he doesn't even know if he saw the MSDS that day.  *Id.* at 99-100.

6  According to Mr. Parker, the MSDS sheets were supposed to be kept in the office of the BOAZ.

7  *Id.*, at 100.  Mr. Parker called Sterling Grant, another Salmon Bay employee, to come down to

8  help him.  *Id.,* at 99.  Mr. Parker states that:

9       I was overwhelmed with other things.  I was trying to figure out  - I have to get
         the pump going.  I have to get this thing emptied out.  I've got at least 40 fire
10      department personnel there running around.  The police, Coast Guard was there.  I
        was trying to get done done, so I asked him to come down to get this MSDS
11      sheet.

12  *Id.,* at 99.  Mr. Grant testified that when Mr. Parker called him, he had a hard time understanding

13  Mr. Parker because he was "frantic."  Dkt. 18, at 105.  Mr. Grant stated that he was under the

14  impression that there was a leak.  *Id.*  Mr. Grant testified that he brought the MSDS sheets that he

15  had at home, which were from a prior season.  Dkt. 18, at 106.  James Noble, the marine

16  compliance manager at Salmon Bay, also went to the barge the day of the accident.  Dkt. 18, at

17  74.  He states that he found the correct MSDS, but could not remember where he found it;

18  whether somewhere at the facility, or on the dock, or on one of the two barges, or on the tugboat

19  that was docked there.  Dkt. 18, at 75-76.

20  Dan Dove, one of the Portland hazard materials firefighters that responded to the scene,

21  testified that he took an air quality reading inside tank C3, and the oxygen reading was .06% and

22  that the carbon monoxide readings were higher than the readings that were required for use of

23

24

1  self contained breathing apparatuses.  Dkt. 18, at 48.  Mr. Dove testified that oxygen levels

2  below 19.5% are considered unsafe.  Dkt. 18, at 49.

3         The emergency responders found Mr. Summers deceased in tank C3 of the BOAZ.  Dkt.

4  18, at 34.

5         Mr. Noble, the marine compliance manager at Salmon Bay, testified that it was his job to

6  "learn and be aware of all applicable standards that the company has to adhere to," including

7  Occupational Safety Health Administration ("OSHA") regulations regarding the BOAZ. Dkt. 18,

8  at 67-68.  He acknowledged that the lack of appropriate warnings on the date of Mr. Summer's

9  death was a violation of OSHA regulations found at 29 C.F.R. 1918.93(d)(4).  Dkt. 18, at 69-70.

10  On May 16, 2012, OSHA issued a citation and penalty against Salmon Bay in connection with

11  the incident.  Dkt. 18, at 79-86.  As is relevant here, Salmon Bay was found to have violated 29

12  C.F.R. 1918.93(d)(4), which provides:

13         (d) Entry into hazardous atmospheres. Only designated persons shall enter
           hazardous atmospheres, in which case the following provisions shall apply: . . .
14         (4) To prevent inadvertent employee entry into spaces identified as having
           hazardous, flammable or oxygen-deficient atmospheres, appropriate warning
15         signs or equivalent means shall be posted at all means of access to those spaces.

16  Dkt. 18, at 83.  OSHA fined Salmon Bay $3,000 for violation of 29 C.F.R. 1918.93(d)(4).  Dkt.

17  18, at 85.

18         For purposes of this motion, it is important to note that the parties contest how Mr.

19  Summers ended up in the tank.  Plaintiff contends that Mr. Summers was on the deck looking

20  into tank C3 when he encountered an oxygen deficient atmosphere.  She maintains that he then

21  lost consciousness, fell through the hatch and into the tank.  Defendant maintains that Mr.

22  Summers entered the tank, in violation of company policy, and fell into the material.

23         **B.  PENDING MOTIONS**

24

1.  <u>Plaintiff's Motion Related to the OSHA Regulations and the Parties' Cross</u>
    <u>Motions Related to the *Scindia* Turnover Duty to Warn</u>

Plaintiffs move for partial summary judgment against Salmon Bay, as vessel owner,

arguing that there are no issues of fact that Salmon Bay violated OSHA regulations 29 C.F.R. §

1910.1200(d)(1), 29 C.F.R. § 1910.1200(d)(2); 29 C.F.R. § 1910.1200(d)(6); 29 C.F.R. §

1910.1200(e)(2)(i ); 29 C.F.R. § 1910.1200(e)(2)(ii ); 29 C.F.R. § 1910.1200(e)(2)(iii); 29 C.F.R.

§ 1910.1200(f)(5); 29 C.F.R. § 1910.1200(f)(9); 29 C.F.R. § 1910.1200(g)(2)(iii); 29 C.F.R. §

1910.1200(g)(2)(iv); 29 C.F.R. § 1910.1200(g)(6)(i); 29 C.F.R. § 1910.1200(g)(8); and 29

C.F.R. 29 C.F.R. § 1918.93(d)(4); and the *Scindia* turnover duty to warn.  Dkt. 15.  Plaintiff

argues that a vessel owner's violation of OSHA regulations is evidence of negligence under §

905(b) of the LHWCA.  *Id.*  Plaintiff argues that Salmon Bay as vessel owner violated its duties

as the importer of ammonium lignosulfonate under OSHA's hazard communication standards

by:  1) failing to evaluate the hazards of ammonium lignosulfonate as required by C.F.R. §

1910.1200(d)(1) and 29 C.F.R. § 1910.1200(d)(2); 2) failed to describe in writing its procedures

used to determine the hazards of ammonium lignosulfonate as required by C.F.R. §

1910.1200(d)(6); 3) the MSDS used by Salmon Bay failed to identify the physical and health

hazards presented by ammonium lignosulfonate as required by 29 C.F.R. § 1910.1200(g)(2)(iii)

and 29 C.F.R. § 1910.1200(g)(2)(iv); and 4) Salmon Bay as the importer failed to provide an

adequate MSDS for ammonium lignosulfonate to employers receiving the product as required by

29 C.F.R. § 1910.1200(g)(6)(i).  Plaintiff maintains that Salmon Bay as vessel owner violated its

duties owed under OSHA's hazard communication standards to the employees of third parties,

including Salmon Bay, as employer, by  1) failing to provide on-site access to an MSDS in

violation of 29 C.F.R. § 1910.1200(g)(8); 2) failing to label tank C3 with appropriate hazard

warnings in violation of 29 C.F.R. § 1918.93(d)(4), 29 C.F.R. § 1910.1200(f)(5), and 29 C.F.R. §

1910.1200(f)(9); and 3) failing to develop and implement a written hazard communication

program compliant with the multi-employer workplace requirements set forth in 29 C.F.R. §

1910.1200(e)(2).  Plaintiff argues that Salmon Bay breached the turnover duty to warn as a

matter of law.  *Id.*  Plaintiff does not seek summary judgment on causation, conceding that there

are issues of fact as to this question.  *Id.*

Salmon Bay opposes the motion, and moves for summary dismissal of the turnover duty to

warn claim. Dkt. 20.  It argues that it, in its capacity as vessel owner, did not breach the turnover

duty to warn.  *Id.*  Salmon Bay argues that, as a vessel owner, it only has a duty to warn of latent

dangers, and that Salmon Bay, as an employer, was aware that the holds could contain an oxygen

deficient atmosphere.  *Id.*  Accordingly, the possibility of an oxygen deficient atmosphere in the

tanks was not a latent danger.  *Id.*  Further, it argues that violations of OSHA are generally

determinative of employer liability, not vessel owner negligence.  *Id.*  Salmon Bay argues that

violations of 29 C.F.R. § 1918.93(d)(4) was negligence of Salmon Bay as employer, not as

vessel owner.  *Id.*  It asserts that OSHA hazard communication regulation, 29 C.F.R. §

1910.1200 regulate Salmon Bay's obligation as Summer's employer, not as vessel owner.  *Id.*  It

argues that any breach of 29 C.F.R. § 1910.1200 is immaterial because Salmon Bay as vessel

owner did not breach the turnover duty to warn because Salmon Bay as employer treated the

holds on the BOAZ as if there was an oxygen deficient atmosphere.  *Id.*  It argues that the BOAZ

manual (which instructs stevedores on how to take samples and measure the quantity of product

by opening the hatches) does not provide a basis to impose liability on Salmon Bay as vessel

owner.  *Id.*  Salmon Bay further argues that speculation regarding the aerosolizing (dispersal into

the air) of gases from the tank does not create an issue of material fact over breach of the duty to

warn.  Dkt. 26.  It points to testimony from Salmon Bay stevedores who were actually aware of

1  the fact that lignosulfonate could aerosolize and contribute to an oxygen deficient atmosphere,

2  and so argue that it was not a hazard unknown to Salmon Bay as an employer and was obvious to

3  the employees.  *Id.*  Salmon Bay argues further that lignosulfonate only aerosolizes when the

4  temperature is close to 90 degrees and does not when the temperature is in the 40s as it was the

5  day of the incident.  *Id.*

6       Plaintiff replies, and notes that Salmon Bay essentially concedes the regulatory violations

7  that Plaintiff raises in the Summary Judgment motion, but argues that those violations were in

8  Salmon Bay's capacity as employer, not as vessel owner.  Dkt. 28.  Plaintiff reiterates that

9  Salmon Bay as vessel owner is subject to the hazard communication requirements of 29 C.F.R. §

10  1910.1200 imposed on importers.  *Id.*  Plaintiff argues that Salmon Bay as a vessel owner is an

11  "employer" subject to the multiemployer workplace requirements of § 1910.1200.  *Id.*  Plaintiff

12  argues that violation of § 1918.93(d)(4) is evidence of vessel owner negligence.  *Id.*  Plaintiff

13  points out that there is no issue of fact as to whether an MSDS was readily accessible in Mr.

14  Summers' work area.  *Id.*  OSHA regulations are instructive as to the standard of care required of

15  the vessel owner.  *Id.*  Plaintiff maintains that no reasonable trier of fact could conclude that

16  Salmon Bay as vessel owner did not violate the *Scindia* turnover duty to warn.  *Id*

17       2.   Salmon Bay's Motion Related to the *Scindia* Turnover Duty of Safe Condition

18       Salmon Bay additionally moves for summary judgment on the turnover duty of safe

19  condition, arguing that it did not breach the turnover duty of safe condition, and is entitled to a

20  judgment as a matter of law.  Dkt. 20.  It argues that at the time of turnover, the BOAZ was in

21  such a condition that the stevedores could safely check the cargo level, safely take samples and

22  safely unload the barge.  *Id.*  Salmon Bay argues that a sounding tube offered a safe way for an

23  experienced stevedore to check the cargo height and take samples.  *Id.*  It notes that the access

24

1    hatches to the tanks were closed when the BOAZ was turned over. *Id*. It asserts that any

2    problems with the pumps are immaterial because it did not affect stevedoring operations. *Id*.

3    Salmon Bay urges the Court to divide the Salmon Bay operations into vessel owner and

4    employer operations. *Id*.

5       Plaintiff responds, and argues that there are issues of fact on whether Salmon Bay, as

6    vessel owner, did violate the duty of safe turnover. Dkt. 22. Plaintiff argues that the deficiency

7    of the BOAZ pumping system and the lack of sounding equipment required workers to

8    frequently check tank levels by opening the hatches, thereby exposing them to the oxygen

9    deficient atmosphere on the deck above the hatch openings. *Id*. Plaintiff argues that even if

10   Salmon Bay warned its longshore employees of an oxygen deficient atmosphere in the holds of

11   the BOAZ, that is immaterial to its failure to warn of the oxygen deficient atmosphere on deck at

12   the hatch openings. *Id*. Plaintiff argues that these vessel conditions were a substantial cause of

13   Mr. Summer's death. *Id*.

14      Salmon Bay replies, and argues that any problems with the pump were immaterial to the

15   incident and asserts that it provided the proper equipment. Dkt. 26. It argues that this should not

16   be a basis for denying summary judgment. Dkt. 26.

17       3. <u>Salmon Bay's Motion Related to Claim for Punitive Damages</u>

18      Salmon Bay also moves for summary dismissal of Plaintiff's punitive damages claim.

19   Dkt.20 (*citing Exxon Mobile Corp. v. Minton,* 285 Va. 115, 133 (Va. 2013)(*cert. denied* 133 S.

20   Ct. 2812 (2013)). Plaintiff responds and argues that punitive damages are recoverable under

21   general maritime law and in claims brought under 33 U.S.C. § 905(b). Dkt. 22. Salmon Bay

22   replies and argues that there is no governing precedent on the issue and so the Court should

23   engage in a *de novo* review on the question. Dkt. 26.

24

**C.  ORGANIZATION OF OPINION**

This opinion will first provide the standard on summary judgment and a brief overview of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 *et seq.*  It will then discuss the Plaintiff's motion for summary judgment on the OSHA violations in the same section that addresses the parties cross motion for summary judgment on the claim for breach of turnover duty to warn.  Next, Salmon Bay's motion to summarily dismiss Plaintiff's claim for breach of the turnover duty of safe condition will be considered.  This opinion will lastly address Salmon Bay's motion for summary judgment as to the punitive damages claim.

## II.   DISCUSSION

**A.  SUMMARY JUDGMENT STANDARD**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt.").  *See also* Fed.R.Civ.P. 56(e).  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty*

1   *Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors*

2   *Association*, 809 F.2d 626, 630 (9th Cir. 1987).

3        The determination of the existence of a material fact is often a close question.  The court

4   must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

5   e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, T.W. *Elect.*

6   *Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor

7   of the nonmoving party only when the facts specifically attested by that party contradict facts

8   specifically attested by the moving party.  The nonmoving party may not merely state that it will

9   discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

10   to support the claim.  *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

11   Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not

12   be "presumed."  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

13   **B.  LONGSHORE AND HARBOR WORKERS' COMPENSATION ACT**

14        The LHWCA, 33 U.S.C. §§ 901 *et seq*., allows longshoremen who have been injured during

15   the course of their employment to be compensated by their employer.  *Christensen v. Georgia*

16   *Pacific Corp.,* 279 F.3d 807, 812 (9th Cir. 2002).  "[A]n employee may not recover in tort for the

17   negligence of his employer; rather, he is entitled to statutory payments" under § 905(a) of the

18   LHWCA.  *Scheuring v. Traylor Bros., Inc*., 476 F.3d 781, 787 (9th Cir. 2007)(*citing* 33 U.S.C. §

19   905(a)).

20        Under § 905(b), however, an employee can recover for the negligence of a vessel owner.  *Id.,*

21   at 788 (*quoting* 33 U.S.C. § 905(b).  "In the event of injury to a person covered under this

22   chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to

23   recover damages by reason thereof, may bring an action against such vessel ....").  In this case, it

24

1   is undisputed that Salmon Bay was both Mr. Summer's employer and the vessel owner.  "A case

2   such as this is commonly referred to as a 'dual-capacity' suit.  *Scheuring,* at 788.  "When the

3   vessel owner and the employer are the same entity, an employee may recover for negligence if

4   the negligence was that of the employer acting in its capacity as a vessel owner, not as an

5   employer."  *Id.* (*citing Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 531 n.6 (1983).

6        In order to recover for negligence against a vessel owner under § 905(b), a plaintiff must

7   show that the vessel owner owed them a duty, the vessel owner breached that duty, and the

8   breach caused the plaintiff's injuries.  *See generally Scindia Steam Navigation Co., Ltd. v. De*

9   *Los Santos*, 451 U.S. 156, 166 (1981).

10        In so far as duty is concerned, "the vessel owes to stevedore and his longshoremen

11   employees the duty of exercising due care under the circumstances."  *Scindia Steam Navigation*

12   *Co., Ltd. v. De Los Santos*, 451 U.S. 156, 166 (1981)(*internal quotations omitted*).  For

13   negligence claims under § 905(b), "[s]hipowners owe three narrow duties to longshoremen: a

14   turnover duty; a duty to exercise reasonable care in the areas of the ship under the active control

15   of the vessel; and a duty to intervene."  *Quevedo v. Trans-Pacific Shipping, Inc*., 143 F.3d 1255

16   (9th Cir. 1998).  The turnover duty is divided into two types of duties, the turnover duty to warn

17   and the turnover duty of safe condition.  *Id.*

18        Plaintiff here asserts § 905(b) negligence claims against Salmon Bay, as vessel owner, based

19   on Salmon Bay's alleged breach of its turnover duties.  Dkt. 15.  Plaintiff alleges that both

20   components of the turnover duty – the duty to warn and the duty of safe condition – were

21   violated and caused Mr. Summer's death.  *Id.,* at 8.  Plaintiff's motion only seeks a ruling that

22   Salmon Bay had, and breached, its duty to warn.  *Id.*  She does not move for summary judgment

23   regarding Salmon Bay's duty of safe condition, or on causation, or on damages.  *Id.*  Salmon Bay

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT- 14

1    moves for summary dismissal of Plaintiff's § 905(b) claims, arguing that there are no issues of

2    fact as to its violation of either of the turnover duties, neither the duty to warn nor turnover of

3    safe condition, and so both claims should be dismissed.  Both parties' motions will be addressed

4    below.

5        **C.  TURNOVER DUTY TO WARN**

6        The turnover duty to warn "requires the vessel to warn the stevedore of any hazards on the

7    ship or with respect to its equipment, so long as the hazards are" 1) "known to the vessel or

8    should be known to it in the exercise of reasonable care," and 2) "would likely be encountered by

9    the stevedore in the course of his cargo operations, are not known by the stevedore, and would

10   not be obvious to or anticipated by him if reasonably competent in the performance of his work."

11   *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 98-99 (1994)(*citing Scindia,* at 167).  "Most

12   turnover cases brought under § 5(b) concern the condition of the ship itself or of equipment on

13   the ship used in stevedoring operations."  *Id.,* at 99.  "The turnover duty to warn, however, may

14   extend to certain latent hazards in the cargo stow . . . because an improper stow can cause

15   injuries to longshoremen," and so are "among the hazards on the ship to which the duty to warn

16   attaches."  *Id*. (*internal quotations and citations omitted*).

17      "The vessel's turnover duty to warn of latent defects in the cargo stow and cargo area is a

18   narrow one."  *Howlett,* at 105.  "The duty attaches only to latent hazards," defined as 1) "those

19   hazards that are known to the vessel or should be known to it in the exercise of reasonable care"

20   and 2) "hazards that are not known to the stevedore and that would be neither obvious to nor

21   anticipated by a skilled stevedore in the competent performance of its work."  *Id.* (*citing Scindia,*

22   at 167).

23

24

1   There are issues of fact precluding summary judgment for either party on Plaintiff's § 905(b)

2   negligence claim against Salmon Bay, as vessel owner, regarding whether Salmon Bay had, and

3   breached, its turnover duty to warn.  Importantly, parties hotly contest how Mr. Summers ended

4   up in the tank of the BOAZ.  Plaintiff argues that lignosulfonate created an oxygen deficient

5   environment over the hatch, and that Mr. Summers, while looking into the tank via the open

6   hatch, lost consciousness and fell into the tank.  Salmon Bay believes that Mr. Summers entered

7   the tank, (despite company warnings not to do so) and lost consciousness while inside the tank.

8   Due to the issues of fact as to causation, it is difficult to determine on summary judgment what

9   latent hazard Salmon Bay had a duty against warn of.  Assuming the latent hazard is the

10   condition on the deck over the open hatch, the following analysis of the *Howlett* elements

11   demonstrates, there are issues of fact as to whether this was the type of hazard for which Salmon

12   Bay had a duty to warn.

### 1.  Hazard Known to Vessel or Vessel Should Have Known of Hazard?

14   There are issues of fact as to whether the conditions on the deck over the hatch were "latent

15   hazards" that were known to Salmon Bay.  Plaintiff argues that even if Salmon Bay did not know

16   of the hazards, it should have known of these hazards.  "Absent actual knowledge of a hazard,

17   then, the duty to warn may attach only if the exercise of reasonable care would place upon the

18   shipowner an obligation to inspect for, or discover, the hazard's existence."  *Howlett,* at 99.

19   Plaintiff argues that Salmon Bay, as vessel owner, was an "importer" and "employer" and had

20   certain obligations under OSHA regulations.  Dkt. 15.  Plaintiff argues that violations of the

21   OSHA regulations are evidence of Salmon Bay's negligence under § 905(b) of the LHWCA.  *Id.*

22   However, there are issues of fact as to whether Salmon Bay, as vessel owner, is an "importer" or

23

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT- 16

1    "employer" under the OSHA regulations, and accordingly no finding can be made now regarding

2    the purported violations of the OSHA regulations.

3        Moreover, even if Salmon Bay, as vessel owner, was obligated to follow the various

4    provisions of OSHA, as an "importer" or "employer" under the relevant regulations, and failed to

5    do so, it is still not clear how those violations result in a breach of the vessel's duty warn of

6    latent dangers such that summary judgment for either party is appropriate.  The OSHA

7    violations, if they apply, may be **evidence** of negligence, and subject to evidentiary rulings at

8    trial.  Assuming that the oxygen deficient atmosphere on the deck at the hatch openings was a

9    latent hazard that Salmon Bay should have known of, that does not end the inquiry.

10       In addition to latent hazards being those hazards that the vessel owners either knew of or

11   should have known of, in order for the duty to warn to attach, latent hazards also must be

12   "hazards that are not known to the stevedore and that would be neither obvious to nor anticipated

13   by a skilled stevedore in the competent performance of its work."  *Howlett,* at 99.

14                    2.   Hazard Unknown and Unobvious to a Competent Stevedore?

15        There are issues of fact as to whether the hazard here was known, obvious or would be

16   anticipated by a skilled stevedore.  Salmon Bay points to testimony from its stevedores who were

17   actually aware of the fact that lignosulfonate could aerosolize and contribute to an oxygen

18   deficient atmosphere in the tanks, and so argue that it was not a hazard unknown to Salmon Bay

19   as an employer and was obvious to the employees.  Dkt. 26.  Plaintiff properly points out though,

20   that even if Salmon Bay warned its longshore employees of an oxygen deficient atmosphere in

21   the holds of the BOAZ, that is immaterial to its failure to warn of the oxygen deficient

22   atmosphere on deck at the hatch openings.  Dkt. 22.  Likewise, the employees' knowledge of the

23   oxygen deficient atmosphere in the tanks does not indicate that they had knowledge of an oxygen

24

1   deficient atmosphere on the deck.  Plaintiff notes that Salmon Bay as vessel owner was not

2   aware of the oxygen deficient atmosphere on deck at the hatch openings, did not investigate the

3   possibility, and did not warn others.  *Id.*  Although Salmon Bay argues further that lignosulfonate

4   only aerosolizes when the temperature is close to 90 degrees and does not when the temperature

5   is in the 40s as it was the day of the incident, the evidence it offers in support of this contention

6   is only that of Sterling Grant, another stevedore, who testified that he had not experienced

7   symptoms consistent with it aerosolizing when it was cold.  *Id.*  Plaintiff's expert opined that it

8   did, and that was, in part, the cause of Mr. Summer's death.  Dkts. 20-9, at 26 and 25.  Further,

9   although Salmon Bay argues that by the time the emergency responders arrived there was no

10   noticeable oxygen depletion above the tank, that does not directly dispute Plaintiff's evidence

11   that at the time Mr. Summers fell into the tank there was an oxygen deficient atmosphere above

12   the hatch.  There are issues of fact as to whether the hazard here was known, obvious or would

13   be anticipated by a skilled stevedore.  Summary judgment is not appropriate for either party on

14   this issue.

15      **D.  TURNOVER DUTY OF SAFE CONDITION**

16     The turnover duty of safe condition requires that the owners of the vessel "exercise ordinary

17   care under the circumstances to have the ship and its equipment in such condition that an expert

18   and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo

19   operations with reasonable safety to persons and property."  *Bjaranson v. Botelho Shipping*

20   *Corp., Manila*, 873 F.2d 1204, 1207 (9th Cir. 1989)(*citing Scindia*, at 167).  The turnover duty of

21   safe condition is qualified:  "in preparing the ship for a cargo operation, the vessel must exercise

22   ordinary care in light of the fact that the operation will be conducted by an expert and

23   experienced stevedore."  *Id.*  This implies, accordingly, "that certain dangers that may be

24

1  hazardous to unskilled persons need not be remedied if an expert and experienced stevedore

2  could safely work around them." *Id.*

3       Salmon Bay moves for summary judgment on the turnover duty of safe condition, arguing

4  that it did not breach the turnover duty of safe condition, and is entitled to a judgment as a matter

5  of law. Dkt. 20. Salmon Bay's motion should be granted, in part, and denied, in part.

6       To the extent that Plaintiff bases her negligence claim on Salmon Bay's, as vessel owner,

7  turnover duty of safe condition on the state of repair of the BOAZ pumps, the claim should be

8  dismissed. It is undisputed that the BOAZ pumps were not being used the day of the accident.

9  So, even if Salmon Bay did breach its turnover duty of safe condition in regard to the pumps,

10  Plaintiff has failed to point to evidence that that breach caused Mr. Summers' death. Salmon

11  Bay's motion to summarily dismiss the claim regarding the pumps should be granted.

12       To the extent that Plaintiff bases her negligence claim on Salmon Bay as vessel owner's

13  turnover duty of safe condition regarding the lack of sounding equipment or other means by

14  which to safely check product levels in the BOAZ tanks, the claim should not be dismissed.

15  There are issues of fact as to whether Salmon Bay breached the turnover duty of safe condition

16  in regard to sounding equipment. First, there are issues of fact as to whether sounding equipment

17  is the responsibility of the vessel owner. Plaintiff points to expert testimony that it is the vessel's

18  responsibility (Dkt. 24, at 11) Salmon Bay points to conflicting testimony (Dkt. 20-11). Further,

19  assuming that it is the vessel's responsibility, there are also issues of fact as to whether proper

20  sounding equipment was on the BOAZ. The record contains testimony that the BOAZ did have

21  a smaller opening from which product levels could be tested, with, for example, a plumb bob.

22  Dkt. 20-10, at 7. Salmon Bay's president filed an affidavit in reply to the motions, in which he

23  stated that ullage tapes are available to check product levels. However, there was no testimony

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT- 19

that there were any sounding tapes, plumb bobs or ullage tapes[1] on the BOAZ the day of the accident.  Further, the testimony from the witnesses present was that the hatches had to be opened to observe how much product was entering the tanks to prevent the vessel from becoming unbalanced and listing.  Accordingly, the motion to summarily dismiss this portion of Plaintiff's negligence claim against Salmon Bay for breach of the turnover duty of safe condition should be denied.

**E.  PUNITIVE DAMAGES**

Salmon Bay also moves for summary dismissal of Plaintiff's punitive damages claim, arguing that such damages are precluded by 33 U.S.C. § 905(b).  Dkt. 20.

As a starting point, the U.S. Supreme Court has held that "[t]he general rule that punitive damages were available at common law extended to claims arising under federal maritime law." *Atlantic Sounding Co. v. Townsend,* 557 U.S. 404, 411 (2009).  As a result, a plaintiff "is entitled to pursue punitive damages unless Congress has enacted legislation departing from this common law understanding.  *Id.*, at 415.  In determining the scope of a statute, the court first looks to its language, giving the words used their ordinary meaning.  *Moskal v. United States,* 498 U.S. 103, 108 (1990) (*citations and internal quotation marks omitted*).

Section 905(b), provides that if a longshoreman is injured by the negligence of a vessel, "then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against the vessel as a third party in accordance with the provisions of section 933."  33 U.S.C. §905(b).  It further provides that "[t]he remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter." *Id.*

---

[1] These terms and their uses are not well defined or clearly described in the pleadings.

1    Plaintiff's claim for punitive damages should not be dismissed.  Contrary to Salmon Bay's

2    argument, the statutory language of § 905(b) does not limit what damages are available for the

3    negligence of a vessel.  The common law rule allowing for punitive damages applies.  Further, §

4    933(e)(2) of the LHWCA contemplates damages in excess of compensatory damages.  33 U.S.C.

5    §933(e)(2).  Section 933 references the process by which an assignee (an employer or insurance

6    carrier perhaps) can recover against a vessel for benefits the employer paid to an injured

7    longshoreman.  33 U.S.C. §933(e).  Section 933(e) is a further indication that the common law

8    rule of the availability of punitive damages was not abrogated by Congress in the LHWCA.

9    Salmon Bay's motion to summarily dismiss the claim for punitive damages should be denied.

10   **F.  CONCLUSION**

11   The parties' cross motions for summary judgment should be denied, except Salmon Bay's

12   motion to summarily dismiss Plaintiff's § 905(b) claim for the turnover duty of safe condition

13   based on the state of repair of the BOAZ pumps.  To the extent that Plaintiff bases her § 905(b)

14   claim for negligence on the turnover duty of safe condition based on the state of repair of the

15   BOAZ pumps, the claim should be dismissed.

16                                   **III.    ORDER**

17   Therefore, it is hereby **ORDERED** that:

18   - Plaintiff's Motion for Summary Judgment (Dkt. 15) **IS DENIED;**

19   - Defendants Cross Motion for Summary Judgment (Dkt. 20) **IS GRANTED** as to

20   Plaintiff's § 905(b) negligence claim for the turnover duty of safe condition based

21   on **the** state of repair of the BOAZ pumps, and **DENIED** in all other respects; and

22   - Plaintiff's § 905(b) negligence claim for the turnover duty of safe condition based

23   on the state of repair of the BOAZ pumps **IS DISMISSED**.

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT- 21

1     The Clerk is directed to send uncertified copies of this Order to all counsel of record and

2  to any party appearing pro se at said party's last known address.

3     Dated this 4th day of November, 2013.

4

5

6  ROBERT J. BRYAN
   United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24